IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

HENRY LUCAS, JR.,                    :

       Plaintiff,

                          Case No. 3:17-cv-00275

      v.                                    :

                          JUDGE WALTER H. RICE

UNITED PARCEL SERVICE, INC.,

       Defendant.                        :

---

DECISION AND ENTRY OVERRULING IN PART AND SUSTAINING
IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON
COUNT ONE, DISABILITY IN VIOLATION OF O.R.C. § 4112.02(A),
AND OVERRULING SAID MOTION FOR SUMMARY JUDGMENT ON
COUNT TWO, RACIAL DISCRIMINATION UNDER TITLE VII AND
O.R.C. § 4112.02(A) (DOC. #20); DEFENDANT'S MOTION IN LIMINE
TO EXCLUDE IMPROPER COMPARATORS (DOC. #47) OVERRULED
WITHOUT PREJUDICE TO REFILING AND/OR ORALLY RENEWING
AT TRIAL

---

Plaintiff, Henry Lucas, Jr. ("Lucas" or "Plaintiff"), has filed a Complaint

against his former employer, United Parcel Service, Inc. ("UPS" or Defendant).

Count One alleges that UPS unlawfully discriminated against him due to a

disability in violation of O.R.C. § 4112.02(A). Count Two alleges racial

discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. § 2000e-2 et seq; 42 U.S.C. § 2000e-2(a) and (k) ("Title VII") and O.R.C.

§ 4112.02(A).

This matter is before the Court pursuant to a motion for summary judgment, Doc. #20, filed by UPS. Lucas has filed a response, Doc. #29, and UPS has filed a reply, Doc. #33. Defendant has also filed a Motion *in Limine* to Exclude Improper Comparators ("Motion *in Limine*"), Doc. #47. Plaintiff has not filed a response to the motion.

For the reasons set forth below, Defendant's motion for summary judgment, Doc. #20, is sustained under O.R.C. § 4112.02(A), Count One, as to Plaintiff's claim that UPS failed to provide him a reasonable accommodation and overruled as to whether UPS terminated him based on his disability. Defendant's Motion for Summary Judgment, Doc. #20, is overruled as to Count Two for racial discrimination under Title VII and his state law claim for racial discrimination under O.R.C. § 4112.02(A). Defendant's Motion *in Limine* is overruled without prejudice to refiling and/or orally renewing at trial.

I.    **Background Facts**

Since March of 2008, Lucas, an African American, had worked as a part-time unloader and later as a loader for UPS at its distribution center in Piqua, Ohio. Doc. #18, PAGEID##107, 81 and 78. At the time of his termination in January 2016, he was the only African-American loader. Doc. #18, PAGEID#81. There was one other African-American who was an unloader. *Id.* Plaintiff's job as a loader required him to put packages into the back of the brown UPS delivery vans ("package cars"). The package cars were pulled inside the Piqua distribution

center with the front of the vehicles facing out and the rear backed up to a dock. *Id.* PAGEID#78-80. The packages, which were placed in the package cars, moved through the center on a series of belts. *Id.*, PAGEID#79. The job of a loader was fast paced and often times required lifting heavy boxes off the belt and then stacking them in the vehicles. Doc. #26-3, PAGEID#327. Plaintiff was responsible for loading between two and four package cars. Doc. #18, PAGEID#79. Productivity within the entire distribution center was measured by pieces per hour and the performance of individual employees and supervisors were reviewed based on productivity standards. Doc. #31, PAGEID#706; Doc. #26-2, PAGEID#294. A productivity measurement, based on daily deliveries, also applied to the drivers of the package cars. As a part-time loader, Plaintiff's hours were typically 4:00 a.m. to 9:00 a.m. Doc. #18, PAGEID#81.

Floor drains were underneath the parked package cars, that were inside and being loaded with packages from the belt. *Id.*, PAGEID#86. These drains, which were typically located towards the front of the parked vehicles, were intended to collect oil and other fluids from the package cars. The floor of the center was at a slight incline so that fluids from the vehicles would flow towards the floor drain.

Because of this nature of the work, when a loader needed to take a break to use the restroom, they would first ask permission of their supervisor. This was accomplished either by calling out to a supervisor or ringing a buzzer if no supervisor was in sight. Doc. #26-2, PAGEID#291. Permission was needed so that a replacement loader could be located who would temporarily fill in for the absent

loader. Sometimes a replacement loader was available and other times no one could be found to fill in as a loader. In the absence of a replacement loader, the packages would pile up or continue to go down to the end of the line. Doc. #26-3, PAGEID#332. This left a loader who needed to use the restroom with two options. The first option was to simply leave, use the restroom, return and then shut the line down in order to get caught up. *Id.* The second option was to stop the line before the loader left to go to the restroom. *Id.* Shutting down the line had a detrimental impact on productivity, since the work would be stopped for nine or ten people, Doc. #26-2, PAGEID#284; Doc. #61, PAGEID#1864. Regardless of what option was chosen, "the supervisors are coming over and yelling at you." Doc. #26-3, PAGEID#332. Although there was no formal discipline imposed against a worker, if the line were stopped, the supervisors "were very adamant about do not shut the line off." Doc. #26-3, PAGEID##333-334.

The women's restroom was located on the first floor. The men's restroom, however, was located upstairs. Doc. #18, PAGEID#81; Doc. #32-9, PAGEID#1051. If no replacement was readily available, and in order to save time, it was common for the male loaders to "run to the front of the trucks" and use the floor drains instead of the men's restroom. Doc. #26-3, PAGEID##326-328; Doc. #26, PAGEID##42-43 and 15. Lucas first started using the floor drains about a month after he started working at UPS in 2008. Doc. #18, PAGEID#103. In fact, Plaintiff had been told previously by his supervisor, Roy Lynch, to use the drain since

there was no one to take his place, but to first check with his co-worker, Maria Roberts, to be certain that she does not care. *Id.*, PAGEID#330.

In addition to the male loaders using the floor drains at the Piqua distribution center, the drivers of the UPS package cars, particularly those out in rural areas, would use bottles or plastic bags and urinate inside the package car. Doc. #40, PAGEID##1193, 1200-01. These bottles or bags were sometimes found in the vehicles and removed prior to the loaders putting packages in the back of the package cars. Doc. #61, PAGEID##1886-87; Doc.#26-2, PAGEID#295; Doc. #43, PAGEID#1253.

Lucas's supervisors were Roy Lynch ("Lynch"), Eric Penski ("Penski") and an unidentified woman. If Plaintiff had an issue, however, he was to ask Lynch, *Id.*, PAGEID#68. Lynch, in turn, reported to Penski.

Lucas was diabetic. Because of this condition, he needed to take breaks to use the restroom with greater frequency. Doc. #18, PAGEID#88. About three weeks after Penski started working at the center, Plaintiff told him that he was diabetic. Lynch was told by Plaintiff about his diabetes four or five months earlier. *Id.*, PAGEID#90. Lucas told these two supervisors about his diabetes in order to let them know he "might need relief." *Id.*, PAGEID#91. Lucas was told by Lynch about a month after he started work at UPS in 2008, to use the drains if he could not get any relief. *Id.*, PAGEID#103. At least one other person heard Lynch tell Lucas that if he needed to go to the bathroom and could not get anyone to cover for him, he should urinate in the floor drain "just like everyone else does," as long as his co-

5

worker, Maria Roberts, did not see him. Doc. #26-3, PAGEID#349; Doc. #18, PAGEID##86,101-03. Lucas also testified that while he was never denied an opportunity to go to the men's room as a result of a staffing shortage, Doc. #18, PAGEID#103, if he could not make it due to time constraints, he "just went to the drain." *Id.*, PAGEID#108.

On or about January 12, 2016, a driver of a UPS package car complained that he had been having "issues with an individual urinating out my passenger door," that urine was being left on the "seatbelt, step and inside the door seam" and that the vehicle smelled of urine. Doc. #31, PAGEID#836-37; Doc. #31-1, PAGEID#895.

Unbeknownst to Plaintiff, UPS installed a surveillance camera in the package car that he was loading. The footage from the security camera showed Lucas standing on the bottom step to the entrance of the package car on the passenger side. Doc. #18, PAGEID#90. The steps, much like those on a bus, are located on the inside of the vehicle.

On January 17, 2016, Lucas was instructed to attend a meeting. At the meeting, he was told that someone had been urinating "in a package car" and was asked if he knew anything about it. Lucas denied that he ever urinated inside a package car. He did, however, admit to standing on the bottom step of a package car on the passenger side and aiming outside of the vehicle in the direction of the floor drain. Doc. #18, PAGEID##90-91, 103 and 108.

During the meeting, Lucas explained to Matthew Miracle ("Miracle"), the Piqua Business Manager, that his diabetes caused him to frequently urinate and that urinating in the drain was something everybody did. Doc. #18, PAGEID#107; Doc. #26-14, PAGEID#620. Lucas denied that there was any urine on the step or inside the package car after he left the area. Doc. #18, PAGEID#103.[1]

Following the meeting, Lucas was terminated by UPS "for urinating in a UPS delivery truck." Doc. #20, PAGEID#164; Doc.#59, PAGEID#1670. Miracle, however, testified that the reason for Plaintiff's termination was because it was "a serious offense to urinate on the wheel well of a package car." Doc. #31, PAGEID#758.

Although Plaintiff was told to "use the drains like everyone else," he was never told by his supervisor that he could stand on the bottom step of the package car on the passenger's side and urinate into the floor drain from that location. Doc. #18, PAGEID#104. Although one other loader who worked at UPS at the time of Plaintiff's termination, Mathew Morphew ("Morphew"), also stood on the bottom step of the package car in order to urinate into the floor drain, Doc. #18, PAGEID#101, his supervisor was unaware that he did this. Doc. #39, PAGEID##1181-82. The record does not indicate if Morphew was Caucasian or African-American. Morphew claimed that he stood on the bottom step because

---

[1] UPS also claimed that there was no urine in the package car before they installed the video camera, but that after the camera was removed there was urine on the floor of the vehicle. Doc. #59, PAGEID##1671-72. The video itself, however, does not show any urine. *Id.*, PAGEID#1671.

the trucks were parked too close together and the only way to access the drains was by standing on the steps. Doc. #26-5, PAGEID#408-09.

Following his termination at UPS, Lucas filed a Complaint alleging discrimination pursuant to O.R.C. § 4112.02(A) for disability and discrimination based on race pursuant to Title VII and O.R.C. § 4112.02(A).

## II.    Motion for Summary Judgment

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical

8

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998). In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*,

889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the Court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.    Legal Analysis

### A. Count I, Disability Discrimination Under O.R.C. § 4112.02(A)

In Count I of the Complaint, Lucas alleges, in general, that he suffered from diabetes and that he requested to leave his work station frequently in order to urinate, when necessary, as a reasonable accommodation. Doc. #1, PAGEID#4. The Complaint further alleges that UPS failed to provide him with the reasonable accommodation he requested and that his employment was ultimately terminated because of his disability. *Id.* Lucas asserts that these two violations, not being provided a reasonable accommodation by his employer and being terminated because of his disability, violated § 4112.02(A). This Ohio statute makes it unlawful for an employer to terminate or otherwise to discriminate against an employee with respect to conditions or privileges of employment, or any matter directly or indirectly related to employment, because of an employee's disability. O.R.C. § 4112.02(A); *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 573 (1998). In interpreting the Ohio anti-discrimination statute, "[F]ederal regulations and case law interpreting the Americans with Disabilities Act ("ADA") may provide guidance." *Jones v. Honda of America Mfg., Inc.*, No. 3:13-cv-167,

2015 WL 1036382, *9 (March 9, 2015), citing *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569 (Ohio 1998).

Where direct evidence of disability discrimination is lacking, Ohio courts permit circumstantial and indirect evidence of discrimination in order to evaluate disability discrimination claims. The state courts also utilize the burden-shifting framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Ames v. Ohio Dep't of Rehab. & Corr.*, 23 N.E.3d 162, 2014–Ohio–4774 (Ohio Ct.App.2014) (applying *McDonnell Douglas–Burdine* to a disability discrimination claim brought under O.R.C. § 4112.02(A)). Plaintiff's evidentiary burden of establishing a *prima facie* case in the first step of the burden-shifting analysis is one of production, not persuasion, and it is not "onerous." *Burdine*, 450 U.S. at 255–256. Although the *McDonnell Douglas–Burdine* burden-shifting analysis applies to claims of disability discrimination, direct evidence is required for any alleged failure to accommodate a disability. *Shaver v. Wolske & Blue,* 138 Ohio App.3d 653 (Ohio Ct.App.2000).

The Court will first address Plaintiff's claim that he was terminated due to his disability, followed by his claim that UPS's failed to accommodate his disability.

### 1. Plaintiff's Claim of Disability Discrimination Due to Termination

To establish a *prima facie* case of disability discrimination under § 4112.02(A), Lucas must demonstrate that (1) he had a disability, (2) UPS took an

11

adverse employment action, at least in part because of his disability and (3) even with his disability, he could safely and substantially perform the essential functions of his job. *Stewart v. Bear Mgmt., Inc.*, 98 N.E.3d 900, 904 (Ohio Ct. App. 2017) (*citing Hood v. Diamond Prods.*, 74 Ohio St.3d 298, 302 (1996))

Under Ohio law, a disability is defined as "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." R.C. § 4112.01(A) (13). Lucas contends that his "physical impairment" was his diabetes, which is specifically recognized by Ohio law as "physical or mental impairment," O.R.C. § 4112.01(A)(16)(a)(iii). Plaintiff, however, must still establish that his diabetes "substantially limits one or more major life activities."

With respect to the meaning of "substantially limits," the ADA Amendments Act of 2008, Pub. L. 110–325, 122 Stat. 3553 (2008), was passed, in part, to "state a broad scope of protection to be available under the ADA." *Id.*, at § 2 (specifically rejecting the "standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled'"). Additionally, 29 C.F.R. § 1630.2(i)(1)(i) defines "work" as a "[m]ajor life activity." Accordingly, this Court concludes that Plaintiff has established a disability, as defined in O.R.C. § 4112(A), that "substantially limits" a "major life

activity" and has satisfied the first element of a *prima facie* case under O.R.C § 4112.02(A).

Plaintiff has also satisfied the second and third elements of the *prima facie* case for disability discrimination. Lucas asserts that he was terminated by UPS because of his disability, since after he told his immediate supervisor of his diabetes and his need to urinate frequently, he was instructed to "use the drains like everyone else does." When he did "use the drains," albeit from the bottom step of a UPS package car, located within the truck, Plaintiff was videotaped and called into the January 2016 termination meeting. At that meeting, after Lucas told Miracle he was diabetic and did not urinate in a package car, Miracle, according to Lucas, terminated him "for urinating in a package car." Doc. #18, PAGEID#87.[2] As to the third element, that even with his disability Lucas could safely and substantially perform the essential functions of his job, there is no evidence that Lucas was unable to perform his job as a loader even with his disability. Because Lucas, the employee, has established a *prima facie* case of disability discrimination, the burden shifts to UPS to set forth a legitimate, nondiscriminatory reason for the adverse action taken. *Hood v. Diamond Prod., Inc.*, at 302. If UPS discharges this burden of production, Lucas must then

---

[2] Although UPS argues throughout its motion for summary judgment, Doc. # 20, that Lucas was terminated for "urinating in a package car, Miracle, "the decision-maker," testified that the reason for Lucas's termination was because it was "a serious offense to urinate on the wheel well of a package car." Doc. #31, PAGEID#758. There is no indication in the evidence before this Court as to which wheel well was allegedly involved.

establish that UPS's stated reason was a pretext for impermissible discrimination.
*Id.*

UPS argues, despite the deposition testimony of Miracle that Lucas was terminated for urinating on the wheel well, that "[T]he undisputed facts support that the legitimate, nondiscriminatory cause of Lucas's termination was his decision to urinate while standing inside a package car." Doc. #22, PAGEID#172. UPS further argues that Plaintiff admitted that "a package driver should not have to tolerate urine in his car and that UPS has a right to discipline an employee for urinating in a package car." A review of Lucas's deposition testimony, however, establishes that he consistently denied that he ever urinated inside the package car and that he had previously told his supervisors, Lynch and Penski, that he suffered from diabetes, had a need to urinate frequently and, in response, was told to "urinate in the drain like everyone else." Doc. #26-3, PAGEID#349.

Finally, UPS argues that their decision to terminate Lucas was not a pretext, since Plaintiff conceded that his termination happened immediately after the incident and that he did not tell the decision-maker, Miracle, that he suffered from diabetes until his termination meeting, which was after the termination decision had already been made. Doc. #20, PAGEID#174.

Whether a stated reason is a pretext is "a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and if so, how strong it is." *Chen v. Dow Chem. Co.*, 580

F.3d 394, 400 n.4 (6th Cir. 2009) (no pretext for discrimination established by employee in Title VII racial discrimination claim since employer detailed employee's 18-month history of performance problems). "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation and, if so, how strong it [that explanation] is." *Chen*, 580 F.3d at 400 n.4 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, (1993)). In order "to make a submissible case [to the jury] on the credibility of his employer's explanation," Lucas must establish, by a preponderance of the evidence, either that his employer's proffered reasons (1) had no basis in fact; (2) did not actually motivate his discharge, or (3) were insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chemicals*, 29 F.3d 1078, 1084 (6th Cir. 1994), overruled on other grounds by *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (in order to successfully challenge an employer's credibility of proffered explanations and establish pretext, a plaintiff must introduce additional evidence of discrimination and not simply rely on his *prima facie* case) At all times, "[t]he plaintiff retains the burden of persuasion." *Burdine*, 450 U.S. at 256.

Lucas argues that UPS's proffered reason for his termination is pretextual, since it was "factually false," *Manzer*, 29 F.3d at 1084 (citing *Anderson v. Baxter Healthcare*, 13 F.3d 1120, 123–24 (7th Cir. 1994). Specifically, Lucas asserts that he never urinated inside of a package car, never admitted that he did so at his termination meeting and that there was no urine in the vehicle when he left the

passenger steps of the package car. Moreover, Lucas argues that delivery drivers have not been terminated from UPS even though some of these individuals, while on routes, did not use restrooms and instead urinated inside the package cars utilizing plastic bags and bottles.[3] These bags and bottles were, at times, left in the package cars and removed by the loaders. Accordingly, Plaintiff alleges "[B]y establishing that other employees not in the protected class were not fired even though they engaged in substantially identical conduct,"[4] Lucas has established that UPS's proffered reason was "insufficient to motivate discharge." *Id.*, (*citing McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir.1993)).

Because Plaintiff "has produced evidence from which a jury could reasonably doubt the employer's explanation and, if so, how strong it is" *Chen*, 580 F.3d at 400 n.4, the Court finds that material facts are in dispute. These facts include whether Plaintiff was terminated for "urinating on a wheel well" or for urinating "inside a package car" and, if the latter, the meaning of the word "inside." Because of these disputes, as well as the issue of whether UPS has established "a legitimate nondiscriminatory cause" for Plaintiff's January 2016

---

[3] Although Plaintiff argues that the delivery drivers are "similarly situated comparators," this argument is irrelevant for a disability discrimination claim under O.R.C. § 4102.02(A). The Court will, however, consider this argument for purposes of the racial discrimination claim alleged under Title VII and O.R.C. § 4102.02(A), Count II.

[4] The record is silent as to whether the delivery drivers were Caucasian or African American. The Court will assume, for purposes of this motion and construing the evidence most strongly in favor of Plaintiff, as the party against whom the motion is directed, that the delivery drivers who urinated inside their package cars in bottles or bags were not African-American.

termination, Defendant's motion for summary judgment for Plaintiff's claim that he was terminated due to disability discrimination, under federal and state law, is overruled.

### 2. Disability Discrimination for Failure to Provide a Reasonable Accommodation

With respect to whether UPS has failed to provide Lucas a reasonable accommodation, Ohio law requires that "[A]n employer must make reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business." Ohio Adm. Code 4112–5–08(E)(1). Additionally, "[F]ederal courts have recognized that the duty of an employer to make a reasonable accommodation also mandates that the employer interact with an employee in a good faith effort to seek a reasonable accommodation. *Shaver v. Wolske & Blue*, 138 Ohio App. 3d 653 (Ohio Ct. App. 2000) (citations omitted).

In this case, Lucas has admitted that after he told his supervisors that he was diabetic and that it caused frequent urination, he was accommodated by being allowed to urinate when he needed to do so. Doc. #18-1, PAGEID#146. Lucas has not claimed that he was ever denied the opportunity to use the restroom as needed. He also testified that he was also told by his supervisor that he should "use the drains." Plaintiff has not produced direct evidence that UPS failed to accommodate his disability, *Shaver*, 138 Ohio App.3d 653 (Ohio Ct.App.2000). In fact, he has testified that his disability was accommodated by

UPS. Accordingly, UPS's motion for summary judgment under O.R.C.

§ 4112.02(A), as to its failure to provide a reasonable accommodation to Plaintiff

for his disability, is sustained.

### B. Count II, Racial Discrimination Under Title VII and O.R.C. § 4112.02(A)

Count Two of the Complaint alleges racial discrimination in violation of Title

VII as well as under the analogous Ohio Fair Employment Practices Act, O.R.C.

§ 4112.02(A). Because Ohio courts analyze § 4112 claims utilizing Title VII case

law, the Court will consider Lucas's state law employment discrimination claims

under the Title VII framework. See *Ohio Civil Rights Comm'n v. Ingram*, 69 Ohio

St.3d 89 (1994) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v.

Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 196 (1981) ("reliable, probative, and

substantial evidence" in an employment discrimination case brought pursuant to

O.R.C. Chapter 4112 means evidence sufficient to support a finding of

discrimination under Title VII.)

Title VII makes it unlawful for an employer "to discharge any individual, or

otherwise discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's

race." 42 U.S.C. § 2000e-2(a)(1). As is true with claims of disability discrimination,

a claim of racial discrimination can also be proven either by presenting direct

evidence of discrimination or by presenting circumstantial evidence that would

support an inference of discrimination. *Carter v. Univ. of Toledo*, 349 F.3d 269, 272

(6th Cir. 2003). Because Lucas has no direct evidence that his termination was due

18

to his race, he is left with presenting circumstantial evidence of racial discrimination which must be analyzed under the burden shifting framework of *McDonnell Douglas*-Burdine. Accordingly, Lucas must first establish a *prima facie* case, which then creates a rebuttable presumption of discrimination, with the burden of production then shifting to UPS to articulate a legitimate, nondiscriminatory reason for terminating Plaintiff. If UPS satisfies this burden, Lucas must then establish that the reasons offered by UPS were a pretext for discrimination. *Burdine*, 450 U.S. at 253, citing *McDonnell Douglas*, 411 U.S. at 804. The ultimate burden of discriminatory intent remains on Plaintiff.

In order to establish a *prima facie* claim of racial discrimination under Title VII, Lucas must show that he: 1) is a member of a protected class; 2) was qualified for the job; 3) suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Newman v. Fed Exp. Corp.*, 266 F.3d 401, 406 (6th Cir. 2001). UPS does not contest that Lucas, an African American was qualified as a loader and suffered an adverse employment decision when he was terminated on January 17, 2016. Defendant, however, argues that no *prima facie* case exists, since Lucas "cannot identify a single similarly situated comparator who was also caught on video urinating while standing in a package car." Doc. #20, PAGEID#175.

In response, Plaintiff asserts that the comparators identified by UPS are too narrowly described and argues that the appropriate similarly situated

19

comparators are "all the Caucasian males that admitted to urinating in inappropriate places." Doc. #29, PAGEID#714. According to Plaintiff, these similarly situated comparators include loaders who utilized the drains instead of the restrooms, as well as delivery drivers who urinated in bottles and bags in the package cars a loader. Plaintiff also cites, as a similarly situated comparator, a loader who on one or more occasions urinated on the floor and wall in the restroom. Following an investigation, UPS determined that this individual had a medical condition and was not terminated. According to Plaintiff, these comparators are similarly situated since they all "worked for Mr. Miracle as either drivers or loaders" and, unlike Lucas who had a video camera installed in his package car to document his activities, UPS "made no effort to investigate or discover the drivers that left urine bottles in vehicles" and also did not investigate Plaintiff 's medical condition.

Although a *prima facie* showing requirement is not intended to be onerous, *Burdine* 450 U.S. at 253, in order to satisfy the requirement of being similarly situated, employees must be similar "in all relevant respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998). To be similarly situated, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* An exact correlation with the

employee who received more favorable treatment, however, is not required and courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.*; *See Bobo v. United Parcel Services, Inc.*, 665 F.3d 741 (6th Cir. 2012) (summary judgment in favor of employer against African-American employee alleging discrimination under the Uniformed Services Employment and Reemployment Rights Act (USERRA), Title VII, § 1981 and state discrimination claim reversed since plaintiff, a member of the military reserves, identified several UPS supervisors who were Caucasian and not members of the military reserves who were accused of falsifying records but not discharged).

In *Jackson v. FedEx Corporate Services, Inc.*, 518 F.3d 388 (6th Cir. 2008), the Sixth Circuit reviewed the decision of a district court that dismissed the plaintiff's Title VII claim after finding that there were no similarly situated individuals with whom an employee could be compared for purposes of establishing a *prima facie* case of race discrimination. The plaintiff, an African-American, was one of seven in a software design and development workgroup assigned to the PowerPad project. All members, other than plaintiff, were Caucasian and because of a "workforce adjustment" in the IT Department, all employees were evaluated based upon their short and long-term goals for the "PowerPad" project workgroup. Plaintiff was given the lowest scores in each of the three categories because his skills were no longer needed for the group, while the other employees all received fours. In finding that no one in the group was

similarly situated to plaintiff, the district judge found that four of the members of the group functioned as programmers and were not valid comparators because they did not have the same skills or abilities as plaintiff and that the fifth person had substantial experience as a business analysist and plaintiff had no such experience. In reversing the decision of the district court, the Sixth Circuit stated that

> [I]t was not proper for the district court judge to define the relevant factors based solely upon narrow job functions and FedEx's stated requirements for the PowerPad project. In effect, the district court is requiring an exact correlation. . . The number of employees with whom Jackson could be compared for purposes of establishing a comparable is relatively small. Jackson held a unique position within the workgroup, as he was the only system administrator. The district court's narrow definition of similarly situated effectively removed Jackson from the protective reach of the antidiscrimination laws. (citation omitted) The district court's finding that Jackson had no comparables from the six other employees in the PowerPad project deprived Jackson of any remedy to which he may be entitled under the law.

*Id.* at 396-97.

Although a driver is neither expected nor required to ask his supervisor for a replacement driver when he needs to use the restroom while making deliveries, Lucas has established, for purposes of this motion, that the delivery drivers, like the loaders, operated out of the same distribution center, had the same center manager, and were also subject to productivity measurements. Moreover, UPS has contended that Plaintiff was terminated for urinating while standing inside a package car, Doc. #20, PAGEID##172 and 176, and Lucas has established that

Caucasian package car drivers also urinated inside the package cars and were not terminated for doing so. Doc. #29, PAGEID#714.

Based on the above-cited case law, the Court finds that Plaintiff was treated differently than similarly situated non-protected employees. As such, he has stated a *prima facie* case of employment discrimination under Title VII and § 4112.02(A).

UPS next asserts that even if a *prima facie* case is established, it had a legitimate and nondiscriminatory reason to terminate Plaintiff, since it was "after management caught him urinating while standing inside a package car after the driver of that same car had complained of urine." Doc. #20, PAGEID#176. Lucas, however, argues that this is a pretext. As stated previously in this Decision and Entry, Miracle testified that Plaintiff was terminated for "urinating on a wheel well" not for "urinating inside a package car" as UPS argues in its motion for summary judgment. Moreover, Lucas asserts that he was using the floor drains as an accommodation for his disability in accordance with the instructions of his supervisor, Lynch, and that he never left any urine in the package car. Morphew, a co-worker, has testified that he also stood on the bottom step on the passenger side, inside the package car, in order to access the floor drains when he urinated. He did so because the trucks were parked too close together. Doc. #26-5, PAGEID#408-09. This witness testified that urinating like this did not result in any complaints from drivers about urine getting into the vehicle. Doc. 32-6,

PAGEID#1000.[5] As such, Plaintiff contends that there is no "basis in fact" for

UPS's proffered reason that he was "terminated for urinating while standing

inside a package car after the driver of that same car had complained of urine."

*Manzer*, 29 F.3d at 1084. Finally, Plaintiff asserts that although there were prior

complaints of package cars smelling of urine, there was no evidence that UPS

ever terminated anyone as a result. According to Plaintiff, he was assigned to this

particular package car and videotaped after a report that this vehicle smelled of

urine. As the only African-American male in the center, Lucas has argued that the

proffered reason of UPS was "insufficient to motivate discharge." *Id.*

UPS has also filed a motion for leave to file supplemental authority, Doc.

#45, citing the Court to *McLaughlin v. Fifth Third Bank, Inc.*, No. 18-5712, 2019 WL

2247511(6th Cir. May 24, 2019). In that case, the district court granted summary

judgment in favor of the employer for claims of sex discrimination under Title VII

and age discrimination under the Age Discrimination in Employment Act. The

Court found that the female employees had failed to show that Fifth Third's claim

that the female employees were fired for violating the bank's cash-vault dual-

control policy was a pretext for discrimination, even though three male

employees who violated the same policy were not fired. The Court noted that the

decision was made by the bank, following an "extensive internal investigation"

---

[5] Like the delivery drivers, Morphew's race is not mentioned in either the motion for summary judgment or in his deposition. In the absence of any mention of race, for reasons similar to that set forth in n. 4, *supra*, the Court will assume that this individual is not African-American.

which included reviewing two months of cash-vault security video. On the video,

the female employees were seen violating the dual-control policy while two of the

men were not seen on the video. Additionally, the female employees admitted to

violating the bank policy although the two men did not. The third man, who was

seen on the video, had complained of being bullied into violating the policy by a

supervisor. In discussing pretext, the Sixth Circuit stated that

"When an employer reasonably and honestly relies on particularized facts in

making an employment decision, it is entitled to summary judgment on pretext,

even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless."

*Id.*, at *302, citing *Chen*, 580, F.3d at 400-01. An employee must allege more than

a dispute over facts to overcome the "honest-belief doctrine." *Id.*

> [w]hen the employee is able to produce sufficient evidence to
> establish that the employer failed to make a reasonably informed and
> considered decision before taking its adverse employment action,
> thereby making its decisional process 'unworthy of credence,' then
> any reliance placed by the employer in such a process cannot be said
> to be honestly held.

*Id.*, (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (citation
omitted).

For purposes of a motion for summary judgment, Lucas has produced

"sufficient evidence to establish that the employer failed to make a reasonably

informed and considered decision" before terminating Plaintiff. Specifically, there

does not appear to have been any "extensive internal investigation" engaged in

by UPS as there was in *McLaughlin*. Additionally, Penski, who had set up the

video camera, but was apparently not present during Plaintiff's termination

meeting, had been made aware that Plaintiff was diabetic, did not consult Lynch, Plaintiff's supervisor, until after Plaintiff's termination, and had apparently been told previously by Lynch that urine bottles and bags had been removed from the package cars prior to being loaded with packages. Doc. #51, PAGEID#27, 37 and 38.

Because there are genuine disputes of material facts, i.e., whether Lucas urinated inside the package car or the wheel well, the meaning of "inside" the package car and whether there was urine in the package car, the motion for summary judgment on Count II for racial discrimination in violation of Title VII as well as on any claim that might exist for racial discrimination, pursuant to O.R.C. §§ 4112.02, is overruled.


## IV. Motion *in Limine* (Doc. #47)

UPS has filed a motion *in limine* in order to preclude Lucas and his counsel from introducing any evidence or testimony at trial referring to any comparators "not similarly situated." Doc. #47. Defendant's motion does not specifically identify any witness or document that Defendant contends should be excluded. Instead, UPS asserts that the "inadmissible evidence" "may include" those UPS employees not under Center Manager Matt Miracle who may have urinated in different places and under different circumstances. *Id.*, PAGEID#1294.

Although neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure explicitly authorize the Court to rule on an evidentiary motion *in*

*limine*, the Supreme Court has noted that the practice of ruling on such motions "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). The purpose of a motion *in limine* is to allow the Court to rule on issues pertaining to evidence in advance of trial, in order to both avoid delay and ensure an evenhanded and expeditious trial. *See Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp.2d 844, 846 (N.D. Ohio 2004) (citing *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997)). Pretrial orders also often save the parties time and cost in preparing for trial and presenting their cases. Courts are generally reluctant to grant broad exclusions of evidence *in limine*, however, because "a court is almost always better situated during the actual trial to assess the value and utility of evidence [and the then evidentiary context in which it is offered]," *Koch v. Koch Indus., Inc.*, 2 F. Supp.2d 1385, 1388 (D. Kan. 1998); *accord Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). A court should not make a ruling *in limine* unless the moving party meets its burden of showing that the evidence in question is clearly inadmissible. *Indiana Ins. Co.*, 326 F. Supp.2d at 846; *Koch*, 2 F. Supp.2d at 1388. If this high standard is not met, evidentiary rulings should be deferred so that the issues may be resolved in the context of the trial. *Indiana Ins. Co.*, 326 F. Supp.2d at 846.

In support of its argument that Plaintiff's unidentified comparators must be excluded, Defendant cites to *Ercegovich*, 154 F.3d at 352, which the Court has

previously discussed in this Decision and Entry, as well as a recent Sixth Circuit case, *Gosbin v. Jefferson County Commissioners*, 725 F. App'x 377 (6th 2018).

In *Gosbin*, the Sixth Circuit affirmed the district court's decision that no *prima facie* sex discrimination case existed because the plaintiff's two comparators were not similarly situated. In reaching this decision, the Court in *Gosbin* cited to *Ercegovich* 154 F.3d at 352, and the criteria to be considered in determining whether a comparator is similarly situated. The Court in *Gosbin*, however, also cited *Ercegovich* and reaffirmed that "exact correlation" is not required.

> However, 'the weight to be given to each factor can vary depending upon the particular case.' *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003) (citing *Ercegovich*, 154 F.3d at 352). In other words, context matters and exact correlation is not required. *Ercegovich*, 154 F.3d at 352.

*Gosbin* at 384.

For the above stated reasons, including a more detailed discussion of the evidence to be precluded and the context in which the evidence is to be offered, Defendant's motion *in limine,* Doc. #47, is overruled, without prejudice, to refiling and/or orally renewing at trial.


## IV. Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment, Doc. #20, is SUSTAINED in part and OVERRULED in part. Defendant's Motion for Summary Judgment, Doc. #20, on Plaintiff's claim, under O.R.C.

§ 4112.02(A), Count One, as to whether UPS failed to provide a reasonable accommodation to Plaintiff for his alleged disability, is sustained. Defendant's motion on Plaintiff's claim, under O.R.C. § 4112.02(A), Count One, as to whether Plaintiff was terminated as a result of his disability, is overruled. Defendant's Motion for Summary Judgment, Doc. #20, is OVERRULED as to Count Two for racial discrimination under Title VII and the state law claim for racial discrimination under O. R.C. § 4112.02(A). Defendant's motion *in limine,* Doc. #47, is overruled, without prejudice, to refiling and/or orally renewing at trial.

Date: January 30, 2020

WALTER H. RICE
UNITED STATES DISTRICT JUDGE